# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2018 Term

———————————

No. 16-0869

———————————

**FILED**

**June 5, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## IN RE: PETITION FOR REINSTATEMENT OF L. DANTE DITRAPANO

---

Lawyer Disciplinary Proceeding

REINSTATED SUBJECT TO CONDITIONS

---

Submitted: April 24, 2018
Filed: June 5, 2018

L. Dante diTrapano
*Pro Se*
Charleston, West Virginia
Petitioner

Joanne M. Vella Kirby, Esq.
Office of Disciplinary Counsel
Charleston, West Virginia
Counsel for Respondent

Charles Bagley, Esq.
Huntington, West Virginia
W. Bradley Sorrells, Esq.
Charleston, West Virginia
Counsel for Amicus Curiae
West Virginia Judicial and Lawyer Assistance Program

JUSTICE WALKER delivered the Opinion of the Court.

CHIEF JUSTICE WORKMAN concurs and reserves the right to file concurring opinion.

JUSTICE LOUGHRY dissents and reserves the right to file a dissenting opinion.

1. "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syllabus Point 3, *Comm. on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

2. "A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syllabus Point 3, *Comm. on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

3. "The general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment[,] he must demonstrate a record of rehabilitation. In addition, the court must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an

important consideration." Syllabus Point 1, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980).

4. "Rehabilitation is demonstrated by a course of conduct that enables the court to conclude there is little likelihood that after such rehabilitation is completed and the applicant is readmitted to the practice of law[,] he will engage in unprofessional conduct." Syllabus Point 2, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980).

WALKER, Justice:

For the second time, L. Dante diTrapano petitions this Court for reinstatement of his license to practice law in West Virginia, which was suspended in 2006 and later annulled as a result of multiple, serious acts of misconduct and two felony convictions. When we denied his first petition four years ago, we concluded that Mr. diTrapano did not satisfy his burden of showing that he possessed the integrity and moral character to resume the practice of law. He now presents evidence that he has maintained sobriety and employment, served his criminal sentence, entered into a voluntary five-year monitoring agreement with the West Virginia Judicial and Lawyer Assistance Program (WVJLAP), accepted responsibility for his actions, mentored other lawyers struggling with addiction, and made full restitution. The Hearing Panel Subcommittee (HPS) found that his law license should be reinstated with conditions upon completion of his WVJLAP monitoring agreement. The Office of Disciplinary Counsel (ODC), however, urges us to find that Mr. diTrapano's two felony convictions altogether preclude his reinstatement, regardless of his demonstrated rehabilitation. Based upon the commendable record of rehabilitation and actions since his first petition, we now reinstate Mr. diTrapano's law license, but with conditions, including two years of supervised practice and continued compliance with his five-year WVJLAP monitoring agreement.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. diTrapano began abusing illegal drugs as a teenager in Charleston, West Virginia, and was arrested several times in his early twenties for both possession of illegal

1

drugs and driving under the influence. In 1988, Mr. diTrapano began in-patient treatment for addiction and on February 22, 1989, he gained sobriety. Over the next fifteen years, Mr. diTrapano earned an undergraduate degree, then graduated *summa cum laude* from John Marshall Law School. He was admitted to practice law in both West Virginia and Georgia. Following law school, Mr. diTrapano returned to Charleston and worked at the law firm of DiTrapano, Barrett, & DiPiero. But he stopped regularly attending twelve-step meetings, as had been his habit since 1989.

In 2004, Mr. diTrapano sought medical care for a cough with chest pain and wheezing, but did not inform his treating physician of his history of substance abuse. The physician prescribed him a cough syrup containing hydrocodone and Mr. diTrapano became addicted to the cough syrup and abused it for the next year. Following the accidental drowning of a five-year-old child in his family's pool, Mr. diTrapano began abusing oxycodone and, eventually, crack cocaine.

In 2006, Mr. diTrapano traveled to Florida for a drug rehabilitation program. However, rather than entering treatment, he engaged in additional drug use and was arrested for possession of cocaine. Three weeks later, a federal search warrant was executed on his home in Charleston. Officers seized several loaded firearms, ammunition, and crack cocaine. Mr. diTrapano was arrested again shortly thereafter in Georgia and charged with driving on a suspended license and possession of cocaine. Then,

approximately two months later, Mr. diTrapano was arrested in West Virginia for, among other things, driving on a suspended license and having no motor vehicle insurance.

On June 14, 2006, Mr. diTrapano was indicted in the United States District Court for the Southern District of West Virginia on two separate felony counts: (1) knowingly possessing various firearms in and affecting interstate commerce while being an unlawful user of and addicted to a controlled substance, in violation of 18 U.S.C. § 922(g)(3) and 18 U.S.C. § 924(a)(2); and (2) knowingly making a false statement and representation to a licensed dealer of firearms regarding his dependence on a controlled substance in violation of 18 U.S.C. § 924(a)(1)(A). Mr. diTrapano was arrested the following day pursuant to a federal arrest warrant.

Later that month, the ODC filed a petition seeking the immediate temporary suspension of Mr. diTrapano's license to practice law. That same day, he pleaded guilty to one count of the federal indictment, after which he was released on bond and ordered to report to the Prestera Center in Huntington, West Virginia to complete a twenty-eight day substance abuse treatment program. Following this program, Mr. diTrapano was released on conditional home confinement pending sentencing. But Mr. diTrapano violated the terms of his release and, as a result, it was revoked in September of 2006. Right away, the ODC supplemented its petition to this Court seeking immediate temporary suspension of Mr. diTrapano's law license. We granted the ODC's petition on September 14, 2006.

In August of 2006, Mr. diTrapano was sentenced in federal court to a term of imprisonment of six months and a term of three years supervised release with a recommendation that he participate in a substance abuse treatment program. After serving his sentence but while still on supervised release, Mr. diTrapano was again arrested on April 1, 2007, and charged with simple possession of methamphetamine. Nine days later, he tested positive for cocaine and morphine. The federal court revoked Mr. diTrapano's supervised release and ordered that he be imprisoned for two years without any subsequent supervised release.

On November 16, 2006, the ODC filed an amended petition seeking the annulment of Mr. diTrapano's law license based upon Rule 3.18 as a result of his felony conviction of a crime involving moral turpitude and professional unfitness. The petition also alleged that Mr. diTrapano violated Rule 8.4(b) of the Rules of Professional Conduct, which states that it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." On May 10, 2007, this Court annulled Mr. diTrapano's law license. His Georgia law license was annulled the following year.

In 2009, following his release from federal prison, the United States Attorney filed an information charging that in 2005, Mr. diTrapano violated 18 U.S.C. § 1014 (2001) by making false representations to a federally-insured bank to obtain a $500,000 loan. The following month, Mr. diTrapano pleaded guilty to the felony charge based on stipulated

4

facts. Relevant here, those stipulated facts recite that Mr. diTrapano and his client intended to invest in a $500,000 project together at $225,000 each, but that Mr. diTrapano forged his client's signature to obtain the full $500,000 loan in his client's name. The stipulated facts further stated, however, that Mr. diTrapano used only $35,000 of the total $500,000 loan for non-loan related purposes.

The court accepted the plea and sentenced Mr. diTrapano to one day of imprisonment, five years supervised release, and 1,000 hours of community service. In 2012, the federal district court denied Mr. diTrapano's motion for early termination of his supervised release. Mr. diTrapano completed supervised release on January 14, 2015.

## A. Mr. diTrapano's First Reinstatement Petition

On June 1, 2012, pursuant to Rules 3.30 and 3.33 of the Rules of Lawyer Disciplinary Procedure, Mr. diTrapano filed a petition for reinstatement of his law license in West Virginia. The ODC commenced an investigation and held two hearings to address the matter, during which numerous witnesses appeared to testify on behalf of Mr. diTrapano. Upon its review, the HPS concluded that Mr. diTrapano had "presented an impressive array of witnesses who testified at the hearing, and individuals who provided letters in support" which "clearly support [Mr. diTrapano's] reinstatement." Further, the HPS determined that Mr. diTrapano's "addictions were a major mitigating factor" to the "egregious" nature of his two felony convictions. But the HPS was cautious. Despite finding that Mr. diTrapano "has proved a record of rehabilitation by clear and convincing

evidence," the HPS noted that a lengthy period of sobriety had preceded Mr. diTrapano's 2004 relapse. As a result, the HPS "recommend[ed] strong support and monitoring to be included in any conditions for reinstatement."

Additionally, the HPS concluded that even though Mr. diTrapano's federal sentence of supervised release was intended to be "rehabilitative rather than punitive," it could not conclude "that the reinstatement of [Mr. diTrapano's] law license [would] not have a substantial adverse effect on the public in the administration of justice so long as [Mr. diTrapano] [was] serving his sentence of supervised release." Ultimately, the HPS recommended that Mr. diTrapano's "law license be reinstated without further petition or hearings beginning at the end of [Mr. diTrapano's] satisfactory completion and termination of his sentence of supervised release," subject to additional conditions.

Following the HPS's recommendation, this Court granted the ODC's request to consider this matter and on June 18, 2014, we declined Mr. diTrapano's request to reinstate his law license. We found that he had not then satisfied his burden of showing that he possessed the integrity and moral character to resume the practice of law. We further concluded that reinstatement at that time would have a justifiable and substantial adverse effect on the public's confidence in the administration of justice.

## B.    Mr. diTrapano's Current Reinstatement Petition

Two years later, on September 16, 2016, Mr. diTrapano filed a second petition for reinstatement. The ODC investigated and filed an initial report with the HPS on June 26, 2017 and an amended report on July 28, 2017. The HPS held hearings on September 19-20, 2017. In addition to Mr. diTrapano's own testimony, the HPS heard testimony on Mr. diTrapano's behalf from William Stuart Calwell (lawyer and Mr. diTrapano's employer), W. Brad Sorrells (lawyer and Mr. diTrapano's peer mentor in WVJLAP), Dwaine Osborne (friend of Mr. diTrapano), George Daughtery (lawyer and former Executive Director of WVLAP), Teri diTrapano (Mr. diTrapano's wife), Tom Flaherty (lawyer), Robert Albury, Jr. (Executive Director of WVJLAP), Bobbi Holland (Mr. diTrapano's sister-in-law), and Joey Holland (Mr. diTrapano's brother-in-law).

That testimony and other evidence offered at the hearing establish several critical differences between the current reinstatement proceeding and Mr. diTrapano's prior petition for reinstatement. Mr. diTrapano has now finished supervised release, started and complied with the requirements of his WVJLAP monitoring agreement, maintained sobriety and gainful employment for another six years, and accepted full responsibility for his actions.

On January 8, 2018, the HPS issued its recommendation that Mr. diTrapano's law license be reinstated without further petition or hearings upon the completion of the

7

terms of his WVJLAP monitoring agreement, which will continue through November 30, 2021. The HPS also issued the following recommendations as conditions:

> 1. Immediately before completion of the monitoring agreement/contract, Director Albury, his successor or his designee report to the Court as to whether the monitoring contract/agreement currently in place should be extended, as [Mr. diTrapano] volunteered to do;

> 2. [Mr. diTrapano's] practice of law be supervised for a period of two (2) years following his reinstatement pursuant to written agreement between [Mr. diTrapano], his supervisor, and the ODC. The supervising attorney must be someone other than his current employer and the agreement shall, among other matters, require the supervising attorney to: meet at least twice per month with [Mr. diTrapano] and have complete access to [Mr. diTrapano's] files, calendar and trust account. The supervising attorney shall file monthly reports with the ODC and respond to inquiries by the Office. [Mr. diTrapano] shall be candid and cooperative with the supervising attorney and shall follow his recommendations and directives. [Mr. diTrapano] shall not be reinstated until this agreement is executed by all parties;

> 3. Prior to reinstatement, [Mr. diTrapano] be required to pay his dues to The West Virginia State Bar and complete all required CLEs; and

> 4. [Mr. diTrapano] be ordered to reimburse the LDB the costs of these reinstatement proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

The ODC objects to HPS's recommendations and asks this Court to again deny Mr. diTrapano's request for reinstatement.

## II. STANDARD OF REVIEW

We have long held that "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decision about public reprimands, suspension or

8

annulments of attorneys' licenses to practice law."[1] While we give respectful consideration to the recommendations of the HPS, this Court ultimately exercises its own independent judgement regarding reinstatement:

> A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration of the [Board's] recommendations while ultimately exercising its own independent judgement. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable probative and substantial evidence on the whole record.[2]

As the parties do not dispute the HPS's findings of fact, we proceed to review de novo the HPS's recommendation regarding reinstatement.

## III. DISCUSSION

In reinstatement proceedings, the party seeking reinstatement has the heavy burden of showing that he should be permitted to once again practice law. This Court has held

> [t]he general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment, he must demonstrate a record of rehabilitation. In addition, the court must conclude that such reinstatement will

---

[1] Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

[2] Syl. Pt. 3, *Comm. on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration.[3]

And, "in assessing an application for reinstatement[,] consideration must be given to the nature of the original offense for which the applicant was disbarred. Obviously, the more serious the nature of the underlying offense, the more difficult the task becomes to show a basis for reinstatement."[4] We have stated that "the seriousness of the underlying offense leading to disbarment may, as a threshold matter, preclude reinstatement such that further inquiry as to rehabilitation is not warranted."[5]

So, we first consider this threshold question of whether Mr. diTrapano's two felony offenses preclude his reinstatement to practice law. The HPS concluded that Mr. diTrapano's misconduct does not altogether preclude his reinstatement given his record of rehabilitation from addiction. The ODC, however, argues that this Court has repeatedly denied the reinstatement petitions of convicted felons such as Mr. diTrapano and should likewise deny reinstatement in this case.

---

[3] Syl. Pt. 1, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980).

[4] *Id.* at 234, 273 S.E.2d at 571.

[5] *Id.* at 240, 273 S.E.2d at 574 (citing *In re Smith*, 214 W. Va. 83, 585 S.E.2d 602 (1980)).

First, we have never held that a convicted felon is barred from the reinstatement of his license to practice law. Such a rule would run counter to the fact-intensive reinstatement inquiry mandated by Syllabus Point 1 of *In re Brown*, which demands analysis of current attributes (integrity, moral character, and legal competence), the record of rehabilitation, and the impact reinstatement would have on our profession. Moreover, it would unduly constrain the "independent judgment" that this Court must exercise as the final arbiter of lawyer disciplinary matters.[6] Second, upon hearing Mr. diTrapano's 2012 petition for reinstatement, we did not find that his prior felony convictions preclude him from reinstatement. In sum, although the seriousness of Mr. diTrapano's underlying offenses serves as the backdrop to our consideration of whether or not his license should be reinstated, we decline to adopt the ODC's position that a convicted felon may never be reinstated to practice law in West Virginia.

We now turn to the question of whether Mr. diTrapano has overcome the adverse effect of his admitted and serious misconduct by demonstrating a record of rehabilitation. This Court has held that "[r]ehabilitation is demonstrated by a course of conduct that enables the court to conclude there is little likelihood that[,] after such rehabilitation is completed and the applicant is readmitted to the practice of law[,] he will

---

[6] *See* Syl. Pt. 3, in part, *McCorkle*, 192 W. Va. at 286, 452 S.E.2d at 377.

11

engage in unprofessional conduct."[7] We have implemented a five-factor test in evaluating rehabilitation, stating that it is necessary to consider:

> (1) the nature of the original offense for which the petitioner was disbarred; (2) the petitioner's character, maturity, and experience at the time of disbarment; (3) the petitioner's occupations and conduct in the time since his disbarment; (4) the time elapsed since the disbarment; and (5) the petitioner's present competence in legal skills.[8]

Having already discussed the severity of Mr. diTrapano's actions, we move to the second factor—his character, maturity, and experience at the time of disbarment in 2007. As we discussed at length above, Mr. diTrapano's misconduct occurred between 2004 and 2007, and it coincided with the peak of his addiction to various illegal drugs. Since commencing his two-year prison sentence on April 10, 2007, there is no evidence of additional misconduct. Mr. diTrapano's demonstrated sobriety for the past eleven years and lack of any additional misconduct walk hand-in-hand and demonstrate a maturity that was lacking as of the date of his disbarment.

We turn now to the third and fourth factors and consider Mr. diTrapano's occupation and conduct in the period following disbarment, as well as the sheer amount of time that has passed. While serving this sentence, Mr. diTrapano voluntarily participated in a nine-month Residential Drug and Alcohol Assistance Program. Upon being released

---

[7] Syl. Pt. 2, *Brown*, 166 W. Va. at 226, 273 S.E.2d at 567.

[8] *Smith*, 214 W. Va. at 85, 585 S.E.2d at 604 (1980).

from prison, he completed a six-month aftercare program at the Community Corrections Center, a halfway house in Rand, West Virginia. Since then, he states that he has continuously attended substance abuse and family counseling, Alcoholics Anonymous and Narcotics Anonymous meetings (three or four, weekly) and asserts that he has attended church without absence for the last seven years. He is involved in significant community service programs that help other people in the Charleston area who are struggling with addiction.

In December 2016, Mr. diTrapano voluntarily entered a five-year monitoring agreement with the WVJLAP. This program requires Mr. diTrapano to log-in daily, attend three support group meetings each week, attend a monthly counseling session, submit to random drug screens, and meet with a mentor monthly. In addition, he has timely submitted monthly reports detailing his compliance with these requirements. Mr. Albury testified that Mr. diTrapano has been completely compliant with all of the terms and conditions of his WVJLAP monitoring agreement. We find the comprehensive and long-term nature of this monitoring agreement to be significant. Mr. diTrapano praises the WVJLAP program and even serves as a mentor for another lawyer. Also, unlike the last time he petitioned for reinstatement, Mr. diTrapano has now completed his five years of federal supervised release. During this period, he was subject to random drug testing and, therefore, we find it important that he completed the full term without incident.

Mr. diTrapano has been gainfully employed for the vast majority of the time following his release from prison. His current employer, Mr. Calwell, testified that he has been abundantly pleased with Mr. diTrapano's work, having promoted him from paralegal to executive assistant. In fact, Mr. Calwell has tasked Mr. diTrapano with handling all of the firm's finances due to the "integrity and high moral character he has displayed during his employment."

We likewise find that length of the passage of time since disbarment is favorable to Mr. diTrapano's reinstatement request. In a matter of three short years, Mr. diTrapano's entire life was damaged as a result of his drug addiction. Since then, however, Mr. diTrapano has regained and maintained sobriety. For eleven years, Mr. diTrapano has worked daily on overcoming addiction and served the sentence bestowed upon him for the criminal acts committed. Unlike the last time he petitioned this Court for reinstatement, he has taken full responsibility for his actions, has completed his term of federal supervised release, and voluntarily taken on the comprehensive monitoring requirements of his WVJLAP agreement. Simply put, we cannot think of one single action Mr. diTrapano could have taken on his path to recovery that he has not taken. Likewise, we are convinced that his commitment to practicing law again is surpassed only by his commitment to maintaining sobriety.

As to the fifth factor regarding Mr. diTrapano's legal competence, it is undisputed by the ODC that he possesses the legal competence to resume the practice of

law. Given this concession and the glowing testimony from his current employer—who has committed to supervise and promote Mr. diTrapano to associate attorney if reinstated— we need not further consider the issue of legal competence. Upon consideration of these five factors, we find that Mr. diTrapano has demonstrated by clear and convincing evidence a record of rehabilitation sufficient to overcome the severity of his past misconduct.

Our final consideration then is whether Mr. diTrapano's reinstatement would have a "justifiable and substantial adverse effect on the public confidence in the administration of justice."[9] We find that it would not. The ODC's sole argument as to why Mr. diTrapano's reinstatement would have such adverse effect is unconvincing. The ODC argues that "based upon the underlying criminal conduct that lead[sic] to [Mr. diTrapano's] disbarment, the witness testimony discussed herein, and the lack of clear and convincing evidence of rehabilitation… [Mr. diTrapano's] reinstatement would have a justifiable and adverse effect on the public confidence in the administration of justice." The ODC relies almost exclusively on the fact that this Court has "never reinstated the law license of any twice-convicted felon in recovery from addiction who also misappropriated client funds." As previously stated, we have never and currently decline to impose a bright-line rule that felons may never become rehabilitated in such a manner that would warrant reinstatement.

---

[9] Syl. Pt. 1, in part, *Brown*, 166 W. Va. at 226, 273 S.E.2d at 567.

15

We see no reason the public confidence in the administration of justice would be adversely affected by the reinstatement of Mr. diTrapano's law license when he has served the sentences imposed upon him in the criminal proceedings and has shown an exemplary record of rehabilitation through WVJLAP and other addiction counseling. He has been consistently and gainfully employed with his current employer—an attorney who testified on behalf of Mr. diTrapano in these proceedings. Critically, unlike the last time Mr. diTrapano petitioned this Court for reinstatement, he has completed his federal sentence of five years supervised release, fully accepted responsibility for his actions, and made full restitution. Therefore, we do not find that the public perception of the administration of justice would be harmed by reinstating Mr. diTrapano's license to practice law.

## IV. CONCLUSION

We reinstate Mr. diTrapano's law license, effective immediately, pursuant to the following conditions: (1) supervision for a period of two years by a supervising attorney who will file monthly reports with the ODC; (2) continued compliance with his five-year monitoring agreement with WVJLAP; (3) payment of all dues to the West Virginia State Bar; and (4) reimbursement to the LDB of the costs of the reinstatement proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure. The Clerk is directed to issue the mandate contemporaneously herewith.

Petition granted.

**FILED**
**June 5, 2018**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WORKMAN, C. J., concurring:

Every family in West Virginia and indeed the nation has been touched in some way by the tragedy that accompanies the disease of addiction and the almost insurmountable challenges of recovery. Dante diTrapano has demonstrated not only strength, courage, and determination in his long path to recovery, but the willingness to give generously of his time, energy and life experience to others on that same journey.

The record contains powerful endorsements from judges,[1] current and former presidents of the West Virginia State Bar, members of the State Bar, psychologists, teachers, police officers,[2] former partners, co-workers, pastors,[3]

---

[1] A circuit court judge attested that Mr. diTrapano's keen legal skills remain intact: "at a memorial service during the opening of our court term, Dante' beautifully eulogized his late father-in-law, James Coleman. He was eloquent, and spoke from the heart, and being the true litigator he is, spoke with no notes."

[2] A police officer who arrested Mr. diTrapano stated that he witnessed, first hand, Mr. diTrapano when he "had completely bottomed out." He attested to Mr. diTrapano's hard work to "dig himself out of the hole he had placed himself and his family." He stated, unequivocally, that "after witnessing this transformation, I think Mr. diTrapano has learned his lesson, paid his debt to society, and should be given another chance."

[3] Mr. diTrapano is active in community service and speaks to many groups about addiction recovery. Recently, he visited Mount Olive Correctional Facility as part of a local men's prison ministry. The minister stated that Mr. diTrapano's "message was one of hope, love, faith, and perseverance." Moreover, he elaborated that Mr. diTrapano "has not hidden his failures; he has shared them to provide hope to others. He is not the person (continued . . .)

1

community leaders, neighbors, and members of the recovery community, all in support of his petition for reinstatement. Remarkably, over 100 letters were submitted in his support and not one in opposition.

In reclaiming his own life, Mr. diTrapano has been a peer volunteer for other Lawyer Assistance Program ("LAP") participants who are new to recovery and to others struggling with addiction. He is dedicated to his family and held in high respect by a wide range of friends and professional associates in the community.

I write separately to emphasize that our decision today sends the message that there is hope in the battle against the disease of addiction that so many families are facing; and to make clear that West Virginia's legal profession, including our disciplinary system, supports the recovery and rehabilitation of impaired lawyers. The Amici Curiae Brief of the LAP aptly describes this matter as the opportunity for this Court to "embrace the miracle of a colleague who is one of our own."

Mr. diTrapano's father, Rudolph di Trapano, one of West Virginia's most outstanding lawyers, who died last year, made a statement about his son, which, in part, reads: "I believe that when Dante' is reinstated he will flourish as a lawyer, and he will

_____

I read about in the papers 10 years ago, and his journey has given him empathy for other hurting people."

2

make the members of this Court proud that they took the appropriate action on his license."

In oral argument in support of his petition for reinstatement before this Court, Mr. diTrapano said that if his license to practice law is restored, he will treasure it. I sincerely believe that he will. And I hope and believe that he will also treasure, preserve, and continue his remarkable lifelong journey of recovery. He has the potential to make major contributions not only to our legal system, but also to the recovery community by continuing to share his time, his energy, and his life experience to help others on the difficult road to recovery.